**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


In re:                              :        CIVIL ACTION
                                    :
MARGARET J. MYERS,                  :
                    Debtor,         :        NO. 04-CV-5282
                                    :
MARGARET J. MYERS,                  :
                    Plaintiff,      :
        v.                          :
                                    :
SOUTHERN MEDICAL SUPPLY CO.,        :
                    et al.,         :
                    Defendants.     :


**MEMORANDUM AND ORDER**

**Anita B. Brody, J.**                                         **October 17, 2005**



**I. INTRODUCTION**

       This is an appeal from a final judgment of the United States bankruptcy court, dismissing

the Chapter 13 petition of Appellant-debtor Margaret Myers as filed in bad faith.   In re Myers,

No. 04-30938 (Bankr. E.D. Pa. September 21, 2004) ("Myers I").  For the reasons set forth

below, I will affirm the judgment of the bankruptcy court.



**II. FACTUAL BACKGROUND**

       The bankruptcy court found the facts as follows.  In June 1999, Appellee-creditor

Southern Medical Supply Co. (SMS) obtained a $739,044.32 judgment in Georgia state court

against Appellant-debtor's husband, Paul F. Myers, and two corporations owned by him, Alpha

1

Technology and Micro Design.  In January 2001, SMS transferred this Georgia judgment to Bucks County, Pennsylvania, where Mr. and Mrs. Myers reside.

In October 2000, SMS filed a lawsuit in the Bucks County Court of Common Pleas (the "CCP"; the "2000 CCP suit") against Mr. Myers, Appellant-debtor, and Alpha Watch, Inc. ("AWI"), a corporation of which Appellant-debtor was the president and sole or controlling shareholder.  Like the other corporations owned by Appellant-debtor and her husband, AWI was engaged in the sale of "wander-control" and patient-monitoring systems to nursing homes.  Mrs. Myers and her husband were involved in the operations of AWI and both earned income from it. The 2000 CCP suit alleged that the assets of Mr. Myers' corporations, Alpha Technology and Micro Design, had been fraudulently transferred to AWI by Mr. and Mrs. Myers.  On January 15, 2003, Mr. Myers filed a voluntary Chapter 7 bankruptcy petition, and he ultimately received a bankruptcy discharge.

On August 9, 2004, a bench trial began in the 2000 CCP suit to decide SMS's fraudulent conveyance claim.  Appellant-debtor and AWI were the only remaining defendants, and were both represented by Scott L. Feldman, Esquire.  Mr. Myers later testified to the bankruptcy court that, just before the trial commenced, he discussed with his wife the possibility of her filing her own bankruptcy petition.  However, he explained that they decided to await the outcome of the litigation before doing so.

On August 11, 2004, the trial judge in the 2000 CCP suit, Judge Robert J. Mellon, stated that he would issue his judgment in open court on Friday, August 13.  Appellant-debtor was not present in court on the date of this announcement.  However, the bankruptcy court concluded that Mr. Feldman and Mr. Myers, who were both present, believed that the state court intended to

enter judgments against both AWI and Appellant-debtor on August 13, and that they advised

Mrs. Myers of this and recommended a bankruptcy filing.

On August 12, 2004, the day before the state court was to render judgment in the 2000

CCP case, Appellant-debtor filed a bankruptcy petition under Chapter 13.  Her attorneys

promptly informed counsel for SMS and Judge Mellon of her bankruptcy filing.  Earlier that

same week, on August 10, 2004, SMS had commenced an additional lawsuit in the Bucks

County Court of Common Pleas (the "2004 CCP suit").  This lawsuit named Mr. and Mrs. Myers

as defendants, along with Stroll Control, Inc. (SCI), a corporation formed and owned by Mr.

Myers.  In the 2004 CCP suit, SMS sought to enjoin defendants from transferring any assets from

AWI to SCI.  A preliminary injunction hearing was scheduled for August 13, 2004, before Judge

Mellon.

On August 13, 2004, Judge Mellon issued rulings in both the 2000 and 2004 CCP suits

against Mrs. Myers, Mr. Myers, and SCI.  Mr. and Mrs. Myers did not attend the August 13

hearing, but Mr. Feldman was present and asserted that Mrs. Myers' bankruptcy filing the day

before and Mr. Myers' prior bankruptcy filing prevented any adjudications on the two lawsuits.

Thus, the bankruptcy court "consider[ed] it likely that Mr. and Mrs. Myers believed that her

bankruptcy filing, coupled with his bankruptcy discharge, would stay all litigation against

themselves as well as their two corporations."  Myers I, at 4.

In rendering its August 13 decision, the state court explained that it was aware of

Appellant-debtor's bankruptcy filing, but believed that the bankruptcy stay only applied to

matters against her in her individual capacity, not in her capacity as president of AWI.  The state

court orally ruled that Mr. and Mrs. Myers had transferred all of the assets of Alpha Technology

3

and Micro Design to AWI with the intent to defraud SMS.  Furthermore, the state court found

that because AWI operated from the same location as the other two corporations, in the same

business, with the same telephone numbers, and involving the same customers, it was appropriate

to pierce the corporate veil of AWI and hold Appellant-debtor personally liable for the fraudulent

conveyance.  Judge Mellon then stated his intention to enter judgments against AWI and

Appellant-debtor in the amount of the original Georgia state court judgment, plus interest,

totaling $1,198,778.19.  As to Mrs. Myers, judgment was to be entered "in her corporate

capacity, and will be in her individual capacity when the stay is lifted, in the similar amounts."

Myers I, at 5.

        The state court also orally froze all of the assets of AWI and announced its intention to

appoint a receiver for the corporation. Because the state court found that Mr. and Mrs. Myers'

conduct was "solely for the purpose of defrauding creditors" and "obstructed and was designed to

obstruct justice," the court further sanctioned them by awarding attorney's fees to SMS and

referring the case for possible criminal sanctions.  (Def.'s Resp. Pls.' Mot. TRO & PI Ex. A at

13-14.)  After placing these rulings on the record, the state court entered several orders dated

August 13, 2004, which:  (1) entered judgment against Appellant-debtor and AWI in the amount

of $1,198,778.19, (2) placed Mrs. Myers' stock in AWI in constructive trust in favor of SMS

with the stock to be held by the state court, (3) froze the assets of AWI and enjoined defendants

from transferring, selling or otherwise disposing of AWI's assets, (4) appointed a receiver for

AWI, (5) assessed sanctions against defendants in the amount of $55,284.37, (6) directed

Appellant-debtor to appear for a contempt hearing on August 16th due to her failure to appear in

court on August 13, (7) enjoined SCI, as well as Mr. and Mrs. Myers, from transferring any

assets already delivered from AWI to SCI, (8) appointed a receiver for SCI, and (9) enjoined Mr. and Mrs. Myers from owning, operating, investing in, or working for any entity involved in the business of patient monitoring or wander control.

Although Mr. and Mrs. Myers were not present in state court on August 13, the bankruptcy court concluded that Mr. Feldman probably informed them of the substance of the state court's rulings.  Myers I, at 7.  Nonetheless, on August 14, 2004, Mr. Myers withdrew $6,000 from AWI's bank account and $1,184.10 (the entire balance) from SCI's account, in violation of the state court's orders.  The bankruptcy court found that Appellant-debtor knew of her husband's actions regarding these withdrawals.  Moreover, the bankruptcy court found that she approved or appointed her husband vice-president of AWI, and that together they approved the corporate bankruptcy filings of AWI and SCI.  Those two corporations filed voluntary bankruptcy petitions on August 15, 2004, which the bankruptcy court found was probably intended to undo the freeze on their assets and the court-ordered receiverships.  The $6,000 withdrawn from the AWI account was paid to state court counsel for AWI and Appellant-debtor, to her bankruptcy attorneys, and to the bankruptcy attorney for AWI and SCI.

On August 19, 2004, SMS filed a motion in the bankruptcy court to dismiss Appellant debtor's Chapter 13 filing of August 12 as made in bad faith.  On August 23, Appellant-debtor initiated an adversary proceeding against SMS, seeking to void the August 13 state court orders against Mrs. Myers as violations of the automatic bankruptcy stay.  Appellant-debtor also requested a temporary restraining order ("TRO") and preliminary injunction ("PI") enjoining SMS from enforcing the August 13 orders.  The bankruptcy judge, Judge Bruce I. Fox, held a TRO hearing on August 27, 2004, and on August 30 he issued a TRO preventing SMS from

enforcing certain provisions of the state court's orders.  On August 31, SMS moved for relief from the automatic stay.  The bankruptcy court decided to consolidate SMS's motions to dismiss and for relief from the stay with Appellant-debtor's motion for a PI.

On September 10, 2004, Appellant-debtor filed her bankruptcy schedules and proposed Chapter 13 plan.  She listed SMS as an unsecured creditor holding a contingent, unliquidated, disputed claim in the amount of $740,000.  She listed her and her spouse's total income as "$0.00" and proposed a Chapter 13 plan providing for payments to the Chapter 13 trustee of $10 per month for three months.  Prior to August 13, 2004, Mrs. Myers was current on all of her debts other than her obligations to SMS.

According to Appellant-debtor, on September 15, 2004, the state court scheduled a hearing for September 20 to hold her and her husband in civil contempt for violating its orders. (Br. for Appellant at 7.)  On September 17, 2004, Appellant-debtor filed a second motion for a TRO, asking the bankruptcy court to enjoin the CCP contempt hearing as a violation of the automatic stay.[1]  (Id.)  The bankruptcy court did not address this motion directly, however, and on September 21, 2004, the bankruptcy court dismissed the Appellant-debtor's case under 11

_____

[1] Although the bankruptcy court does not refer to the contempt hearing or Appellant-debtor's second request for a TRO, the docket reflects that Mrs. Myers' counsel filed a second motion for a TRO on September 17, 2004, and an addendum to this motion on September 21. (Docket Rprt. for Adv. Proceeding No. 04-00846, at 4.)  While Bankruptcy Rule 8006 prohibits a district court from considering on appeal "items not before the Bankruptcy Court and not considered by it in rendering its decision," In re Neshaminy Office Bldg. Assoc., 62 B.R. 798, 802 (E.D. Pa. 1986), both the second motion for a TRO and the addendum were before the bankruptcy court.  Thus, for purposes of this appeal, I accept Appellant-debtor's uncontroverted assertions that on September 20, 2004, she and her husband were incarcerated for civil contempt by the CCP until they could each pay $5,196 to counsel, at which point Appellant-debtor filed an addendum asking the bankruptcy court to order her release from custody.  (Br. for Appellant at 7.)

U.S.C. 1307(c) as having been filed in bad faith.[2]  Appellant-debtor filed a motion for reconsideration and to convert her case to one under Chapter 7, which the bankruptcy court denied on October 8, 2004.  This appeal followed.

## III. STANDARD OF REVIEW

I have jurisdiction pursuant to 28 U.S.C. § 158(a)(1), which grants the district courts jurisdiction over "appeals from final judgments, orders and decrees" of the bankruptcy court.  Id. The dismissal of a bankruptcy case as a bad-faith filing is "a fact intensive determination better left to the discretion of the bankruptcy court."  In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (quoting In re Love, 957 F.2d 1350, 1355 (7th Cir. 1992)).  Thus, I review the bankruptcy court's decision for abuse of discretion.  See In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999); Lucabaugh v. IRS, 2001 WL 997416, at *2 (E.D. Pa. Jun. 16, 2001).  An abuse of discretion can be based on "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  SGL Carbon, 200 F.3d at 159.  I review the bankruptcy court's legal conclusions de novo but will not disturb its factual findings unless clearly erroneous.  See IRS v. Pransky, 318 F.3d 536, 542 (3d Cir.2003).

## IV. DISCUSSION

### A. Bad Faith

The bankruptcy code, 11 U.S.C. § 1307(c), provides that a Chapter 13 filing may be

---

[2] By dismissing Appellant-debtor's case without addressing her second request for a TRO to remedy the state court's violations of the automatic stay, Judge Fox's ruling had the effect of granting SMS relief from the automatic stay.

dismissed "for cause."  Id.  Although there is no explicit mention of bad faith in 1307(c), a

bankruptcy filing made in bad faith may be dismissed "for cause" under 1307(c).  See Lilley, 91

F.3d at 496; Lucabaugh, 2001 WL 997416 at *2.  The question of whether a filing was made in

bad faith is a fact-intensive inquiry committed to the sound discretion of the bankruptcy court.

SGL Carbon, 200 F.3d at 159.  In deciding whether a filing was in bad faith, a court looks to the

"totality of the circumstances," Lilley, 91 F.3d at 496, and may focus on the following factors,

among others:  (1) the nature of the debt, (2) the timing of the petition, (3) how the debt arose, (4)

the debtor's motive in filing the petition, (5) how the debtor's actions affected creditors, (6) the

debtor's treatment of creditors both before and after the petition was filed, and (7) whether the

debtor has been forthcoming with the bankruptcy court and the creditors.  Id.

      In this case, after examining the totality of the circumstances, the bankruptcy court

concluded that Appellant-debtor's filing had been in bad faith for five reasons:

      (1) Appellant-debtor's decision to time her Chapter 13 petition "after the state court
announced its intention to rule, but just before it did so," Myers I, at 13;

      (2) the conclusion that Appellant-debtor's filing was probably a "tactic to preclude
adverse rulings against [AWI] and [SCI]," id. at 13;

      (3) the fact that SMS's state court claim against Appellant-debtor was for actively,
fraudulently converting assets and represented "the vast majority in dollar amount of the claims
against her," id. at 14 (citing In re Goddard, 212 B.R. 233, 239 (D.N.J. 1997));

      (4) the fact that Mrs. Myers allowed her husband to withdraw $6,000 from AWI's bank
account on August 14th, and use a portion of those funds to pay her bankruptcy counsel, in
violation of the state court's August 13 rulings freezing the assets of AWI and SCI;

      (5) Appellant-debtor's failure to meet the requirements for filing a Chapter 13 case.


      As to the first reason (the timing of the filing), the bankruptcy court noted that while the

filing's timing would not in itself constitute bad faith, it was certainly a relevant factor in the bad-faith inquiry. Id. at 13. The bankruptcy court found that Mrs. Myers had correctly predicted that the state court's ruling would be adverse to her, and that she timed her bankruptcy petition to defeat, or at least delay the ruling, thereby allowing her and her husband "to continue to control and benefit from assets improperly transferred." Id. Appellant-debtor cites several cases, none of them from this Circuit, in which bankruptcy filings made while state court litigation was pending were nonetheless found to be in good faith. See In re Bayer, 210 B.R. 794, 796 (Bankr. 8th Cir. 1997); In re James Wilson Assocs., 965 F.3d 160, 170-71 (7th Cir. 1992); In re Cadwell's Corners P'ship, 174 B.R. 744, 762 (Bankr. N.D. Ill. 1994). However, these cases are readily distinguishable. In Bayer, the state court had not yet entered any findings in the state litigation at the time the bankruptcy petition was filed, nor had the debtor even responded to the suit. See 210 B.R. at 795. Here, by contrast, the state court was poised to issue judgment against Appellant-debtor at the moment she filed for bankruptcy. The other cases Appellant-debtor cites deal with bankruptcies filed to postpone foreclosure sales, and stand only for the proposition that a debtor can file for bankruptcy to prevent foreclosure "if there is a reasonable chance for an effective reorganization." Cadwell's Corners, 174 B.R. at 762 (citing James Wilson, 965 F.3d at 171). However, in this district, it has been held that filing a Chapter 13 petition for the sole purpose of preventing foreclosure may constitute bad faith justifying dismissal. In re Lippolis, 228 B.R. 106, 112 (E.D. Pa. 1998). Here, the bankruptcy court found that the sole purpose of Appellant-debtor's filing for bankruptcy when she did was to frustrate the impending state court judgment. Also, in this Circuit, bankruptcy courts have held that "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose, bad faith

exists." <u>In re Dami</u>, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994); <u>In re Privitera</u>, 2003 WL 21460027, at *2 (Bankr. E.D. Pa. Jun. 12, 2003).

Appellant-debtor's objections to the bankruptcy court's second and third reasons for dismissal are without merit. As to the second reason, that the filing was a tactic to prevent adverse rulings against AWI and SCI, she contends that "it is too late to save AWI or SCI, which the CCP orders have destroyed, from any adverse rulings . . . ." (<u>Id.</u>) However, the mere fact that Appellant-debtor's dilatory tactics did not ultimately succeed does not mean that they were not tactics to begin with. Appellant-debtor also argues that the bankruptcy court's third reason, the fact that the largest claim against her was a claim for fraudulent conveyance, goes only to whether that claim is ultimately dischargeable in bankruptcy, not to whether her petition was filed in bad faith. Yet the fact that the nature of the debt would also have been grounds to challenge its dischargeability does not mean that the bankruptcy court erred in considering it in the bad-faith inquiry. To the contrary, <u>Lilley</u> specifically instructs courts to look to "the nature of the debt" in considering whether a petition was filed in bad faith, as well as "how the debt arose." <u>See</u> 91 F.3d at 496.

Appellant-debtor also asserts that the conduct cited by the bankruptcy court as its fourth reason, the withdrawal of $6000 in violation of the state court orders, was in fact perfectly innocent, as neither Appellant-debtor nor her husband had notice of the orders. (<u>Id.</u>) However, the bankruptcy court specifically concluded that, in all probability, both Mr. and Mrs. Myers had actual notice of these orders through their counsel when they withdrew funds from the frozen AWI account. <u>See</u> <u>Myers I</u>, at 7. As this finding of fact does not appear clearly erroneous, I will not disturb it on appeal.

The bankruptcy court's fifth reason for finding that Mrs. Myers' filing was in bad faith was her probable failure of both the "income-eligibility" and "debt-eligibility" requirements for filing a Chapter 13 petition.  To be eligible for Chapter 13 bankruptcy, a debtor must have:  (1) "regular income" and (2) "noncontingent, liquidated, unsecured debts of less than $307, 675."[3] 11 U.S.C. § 109(e).  With regard to income-eligibility, the bankruptcy court noted that Appellant-debtor listed zero income in her schedules and that her Chapter 13 plan provided for payments of only $10 per month to the Chapter 13 trustee.  As to debt eligibility, the bankruptcy court noted that since SMS's claim against Appellant-debtor exceeded $1 million,[4] the judgment would have put her well over the debt-eligibility limit of 109(e) if it were "noncontingent" and "liquidated" at the time of filing.[5]  After examining the respective definitions of the terms "noncontingent" and "liquidated," the bankruptcy court concluded that "on August 12, 2004, Southern's claim against Mrs. Myers may have been liquidated and not contingent."  Id. at 23.  Because the amount SMS sought from Mrs. Myers was merely the amount of the original Georgia state court judgment plus interest, it was easily calculable on August 12, 2004, and thus "liquidated."  Moreover, because

_____

[3] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, effective October 17, 2005, added an additional requirement that the debtor also have "noncontingent, liquidated, *secured* debts of less than $922,975."  11 U.S.C. 109(e) (emphasis added).  However, this requirement is inapplicable to cases like Appellant-debtor's, which were filed before the effective date of the new Act.  See Pub. L. No. 109-8, § 1406(b)(1).

[4] Including interest, the judgment was over $1 million.  However, even SMS's original judgment of $739,044.32, exclusive of interest, would be well over the $307,675 ceiling of 109(e).

[5] A contingent claim is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event."  Matter of M. Frenville Co., 744 F.2d 332, 336 n.7 (3d Cir. 1984) (internal citations omitted).  A claim is liquidated "if the amount due can be determined with sufficient precision."  In re Pennypacker, 115 B.R. 504, 505 (Bankr. E.D. Pa. 1990).

the state court had already announced its intention to rule against Appellant-debtor on August 11, and the only thing left for it to do on August 13 was to enter judgment, the claim would seem to be no longer "contingent" when Appellant-debtor filed for bankruptcy on August 12.  See id. at 22 (citing cases in which tort claims were held to be noncontingent before entry of judgment).

Appellant-debtor notes, as the bankruptcy court did, that the eligibility requirements of Chapter 13 are assessed "on the date of the filing of the petition."  11 U.S.C. § 109(e).  While conceding that she could not meet Chapter 13's requirements *after* the state court's judgments made her income zero and her debt well above the 109(e) limit, Mrs. Myers argues that she did meet the requirements on August 12, 2004, *prior to* the judgments.  However, the bad-faith inquiry of Lilley allows courts to look not only at the bankruptcy filing itself, but also at the debtor's pre- and post-filing conduct.  See 91 F.3d at 496 (instructing courts to consider, *inter alia*, "the debtor's treatment of creditors both before and after the petition was filed").  The fact that Appellant-debtor ultimately presented a Chapter 13 plan listing her income as zero and her proposed monthly payment as $10 would seem relevant to whether she had a legitimate reorganization purpose in the first place.  See Dami, 172 B.R. at 10 (filing for bankruptcy to defeat state court litigation without valid reorganization purpose constitutes bad faith).  Moreover, there is no merit to Appellant-debtor's assertion that on August 12 she had "no basis to expect" that the state court would render a substantial money judgment against her that would render her ineligible for Chapter 13 relief.  (Br. for Appellant at 17.)  To the contrary, the bankruptcy court found that Mrs. Myers' correct prediction of such a judgment was the driving force behind her bankruptcy filing.

Finally, even if Appellant-debtor could show that she met the requirements of Chapter 13

on the date of filing, it would not mean that the bankruptcy court abused its discretion in dismissing her case as filed in bad faith.  As Judge Fox explained in his opinion denying Appellant-debtor's motion for reconsideration ("Myers II"), "[h]er probable lack of eligibility was but one of five factors, considered 'collectively,' . . . that caused me to exercise my discretion under 1307(c) and to dismiss the case."  Myers II, at 2.

After reviewing the bankruptcy court's reasons for its decision and considering Appellant-debtor's arguments, I conclude that the bankruptcy court did not abuse its discretion in dismissing this case as a bad-faith filing.  The question of bad faith is a fact-intensive inquiry and I have found no factual finding on which the bankruptcy court relied to be clearly erroneous.  Nor were any of the bankruptcy court's legal conclusions in error.  Therefore, I will affirm the judgment of the bankruptcy court dismissing Appellant-debtor's Chapter 13 case as filed in bad faith.

### B. *Conversion to Chapter 7*

Appellant-debtor argues that even if the dismissal of her Chapter 13 filing was proper, the bankruptcy court nonetheless should have allowed her to convert her case to one under Chapter 7.  See 11 U.S.C. § 1307(a) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title at any time.").  However,

> [t]he decision to dismiss or convert a bankruptcy case is within the discretion of the bankruptcy judge.  Once 'cause' for dismissal or conversion has been established under § 1307, whether conversion or dismissal is more appropriate is a question Congress left to the sound discretion of the bankruptcy court.

In re Vincente, 260 B.R. 354, 361 (Bankr. E.D. Pa. 2001) (citing Matter of Sullivan Central Plaza

I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) and Hall v. Vance, 887 F.2d 1041, 1044 (10th Cir.

1989)).  Here, the bankruptcy court did not abuse its discretion in dismissing, rather than

converting, Appellant-debtor's case.

A bankruptcy court need not provide an "exhaustive discussion of its reasoning" when

dismissing or converting a case, Vincente, 260 B.R. at 361 (citing In re Nardi, 1991 WL 255681,

at *2 (E.D. Pa. Nov. 25, 1991)).  Here, the bankruptcy court found that the reasons justifying a

bad-faith dismissal under Chapter 13 also precluded allowing Appellant-debtor to convert to

Chapter 7.  Like Chapter 13 cases, Chapter 7 cases are also subject to dismissal "for cause" if

filed in bad faith.  11 U.S.C. § 707(a); In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).  Thus, in

denying Appellant-debtor's request for leave to convert to Chapter 7, the bankruptcy court

reiterated that "[h]er case was dismissed because of a lack of good faith filing, not because she

was ineligible for chapter 13 relief."  Concluding, as it did, that Appellant-debtor's Chapter 13

was filed in bad faith, the bankruptcy court did not abuse its discretion in denying Appellant-

debtor's request to convert to Chapter 7.


**C. *Violations of the Automatic Stay***

Appellant-debtor argues that the bankruptcy court's dismissal of her case without

conversion to Chapter 7 denied her the opportunity to pursue an adversary proceeding against

Appellee-creditor for violations of the automatic bankruptcy stay.  The bankruptcy court noted:

"If I dismiss this case as filed in bad faith, I believe it inappropriate to retain jurisdiction over

Mrs. Myers' adversary proceeding."  Myers I, at 10; see  In re Smith, 866 F.2d 576, 580 (3d Cir.

1989) (dismissal of bankruptcy case usually results in dismissal of pending adversary

proceedings).  Appellant-debtor argues that the result of the bankruptcy court's ruling is to "exonerate gross violations of the automatic stay."  (Br. for Appellant at 9.)  A bankruptcy court's decision to grant relief from the automatic stay to a creditor is reviewed for abuse of discretion.  Lippolis, 228 B.R. at 111-12.  Although I cannot condone SMS's violations of the automatic stay, the bankruptcy court did not abuse its discretion in deciding that Appellant-debtor was not entitled to a remedy for these violations because she filed for bankruptcy in bad faith.

Appellant-debtor alleges, and SMS does not deny, at least two serious violations of the automatic stay during the course of the bankruptcy.  One was the CCP's entry of orders in the 2000 CCP suit against Mrs. Myers in her "corporate" capacity on August 13, 2004, the day after she had filed for bankruptcy and invoked the protections of the automatic stay.[6]  Another was the CCP's order holding Appellant-debtor in contempt of court and incarcerating her until she could pay $5,196 to counsel.[7]  See In re Cherry, 78 B.R. 65, 70 (Bankr. E.D. Pa. 1987) (civil contempt proceedings are subject to the automatic stay).  I acknowledge that it was the state court, and not SMS, that ultimately took these actions in violation of the stay, despite the fact that Appellant-debtor promptly notified both the court and opposing counsel of her bankruptcy filing.

---

[6] At oral argument on Appellant-debtor's August 27, 2004 motion for a TRO in the bankruptcy court, counsel for Appellee conceded that there is no exception to the automatic stay for orders against a debtor in her capacity as president of a corporation as opposed to her individual capacity, and thus that the CCP's August 13, 2004 order against Appellant-debtor violated the automatic stay.  (Tr. of 8/27/04 at 6.)

[7] As noted above, the bankruptcy court did not address this second stay violation directly in either its September 21, 2004 opinion dismissing Appellant-debtor's case or its opinion denying her motion for reconsideration, and thus effectively granted Appellee relief from the stay with respect to this violation.

However, the state court's complicity in the stay violations does not excuse SMS's role in them. See In re Lori, 241 B.R. 353, 354 (Bankr. M.D. Pa. 1999) (holding that *creditor* violated automatic stay where she obtained state court enforcement of child support order against debtor during pendency of the stay). Indeed, courts have held that where a creditor has set in motion an action against the debtor prior to the bankruptcy filing, once the bankruptcy is filed and the automatic stay takes effect, the creditor has an affirmative duty to notify the court in which the action is pending and "take any other action necessary to assure that the action does not continue." 3 Collier on Bankruptcy ¶ 362.03[3], at 362-15 (Lawrence P. King ed., 15th rev. ed. 1996). Courts have held creditors responsible for passively failing to stop state court actions in violation of the stay.[8] See In re Soares, 107 F.3d 969, 978 (1st Cir. 1997); In re Outlaw, 66 B.R. 413, 416-17 (Bankr. E.D.N.C. 1986). Moreover, Appellant-debtor claims that SMS did not play a mere passive role in the acts of the CCP, but instead actively encouraged the court to violate the automatic stay.

However, courts have held that a debtor's filing of a Chapter 13 petition in bad faith is grounds for granting a creditor relief from the automatic stay. See Lippolis, 228 B.R. at 112 ("To allow a Debtor to file a petition in bad faith and still enjoy Chapter 13's automatic stay would encourage illicit filings . . . ."). The question in this case is whether such relief should be granted retroactively to validate a creditor's actions during the pendency of the stay, which are generally considered *void ab initio*. In re Siciliano, 13 F.3d 748, 750 (3d Cir. 1994). Given the important congressional policy underlying the automatic bankruptcy stay, courts are "especially hesitant to

---

[8] Admittedly, I have found no case requiring a creditor to take extraordinary measures to stop a state court from entering judgment adverse to the debtor where, as here, the state court is fully informed of the pendency of the automatic stay.

validate acts committed during the pendency of the stay." In re Albany Partners, 749 F.2d 670, 675 (11th Cir. 1984). Even though Appellant-debtor's Chapter 13 filing was later found to have been in bad faith, SMS's proper remedy was to seek emergency relief from the automatic stay in the bankruptcy court – not to take the law into its own hands by seeking to have the state court violate the automatic stay.

Nonetheless, in certain circumstances, courts may validate violations of the stay retroactively by "annulling" the stay *nunc pro tunc*. See 11 U.S.C. § 362(d); Siciliano, 13 F.3d at 751. One such circumstance is when the bankruptcy petition has been filed in bad faith. See In re Kissinger, 72 F.3d 107, 109 (9th Cir. 1995) (bankruptcy court did not abuse its discretion in annulling stay where petition was filed in bad faith); Albany Partners, 749 F.2d at 670 (same). The decision whether to annul the bankruptcy stay is committed to the bankruptcy court's discretion and may be reversed only for abuse of that discretion. In re Brown, 311 B.R. 409, 412 (E.D. Pa. 2004). Here, the bankruptcy court noted that Appellant-debtor's bad-faith filing would justify annulling the automatic stay, Myers II, at 3, and in so concluding, the bankruptcy court did not abuse its discretion.

Like the bankruptcy court below, I find Kissinger closely analogous to the present case. There, a lawyer being sued in state court for malpractice filed for Chapter 11 bankruptcy just before the judge was to submit the case to the jury. Kissinger, 72 F.3d at 108. The judge ordered completion of the trial despite the automatic bankruptcy stay, and the jury returned a $90,000 verdict. Id. The bankruptcy court found that the petition was filed in bad faith and granted retroactive relief from the stay to validate the jury verdict; the district court affirmed. Id. In upholding the bankruptcy court's decision, the Ninth Circuit noted that refusing to annul the stay,

17

and thereby voiding the verdict, would have led to bizarre or inequitable results:  either the case would have to be re-submitted to the same jury that had just entered the verdict or the parties would have to complete a costly retrial.  Id. at 109.  Here, Appellant-debtor filed for Chapter 13 bankruptcy in bad faith on the eve of a state court judgment against her, with the intent of frustrating that judgment.  If the bankruptcy court had not effectively annulled the stay, the state court would presumably have had to re-enter its earlier judgment, the creditor would have been put to additional expense, and nothing would have been accomplished except to reward Appellant-debtor's abuse of the bankruptcy code.

      Appellant-debtor cites two cases from other circuits in which bankruptcy courts chose not to exercise their discretion to annul the stay and excuse a creditor's violation, even though the debtor's filing was in bad faith.  See In re Tolbert, 2001 WL 1739142, at *2 (Bankr. D. Md. June 15, 2001); In re Franklin Mortgage & Inv. Co., 143 B.R. 295, 303-04 (Bankr. D.D.C. 1992).  In Franklin, however, the bankruptcy court concluded that because the creditor had not moved to annul the automatic stay, the only issue before it was whether a judgment of foreclosure on the debtor's property, entered while the stay was in effect, was void.  See 143 B.R. at 304.  Thus, this case stands merely for the general proposition, already noted above, that acts taken during the pendency of the automatic stay are presumptively void.  In Tolbert, the bankruptcy court voided a foreclosure sale undertaken during the stay, but specifically refrained from imposing other sanctions on the creditor because "debtor clearly filed with no hope of reorganization."  See 2001 WL 1739142, at *1.  Thus, these cases do not stand for what Appellant-debtor would like them to:  that a creditor's violation of the automatic stay must be punished just as severely even when the debtor's filing was in bad faith.  In any event, even to the extent that these cases support

Appellant-debtor's position, I do not find them persuasive.  Numerous other cases have exonerated violations of the stay where a debtor has filed for bankruptcy in bad faith, reasoning that to do otherwise would reward the bad-faith filing.  See, e.g., In re Burrell, 186 B.R. 230, 236 (Bankr. E.D. Tenn. 1995) ("[S]anctioning the IRS [for violations of the stay] will only further the debtor's misuse of the Bankruptcy Code."); see also Kissinger, 72 F.3d at 109; Albany Partners, 749 F.2d at 670.

**V. CONCLUSION**

    For the foregoing reasons, I will affirm the judgment of the bankruptcy court dismissing Appellant-debtor's Chapter 13 case for "cause" under 11 U.S.C. § 1307(c) without converting it to one under Chapter 7.

## **ORDER**

**AND NOW**, this _17th__ day of October, 2005, it is **ORDERED** that the judgment of the bankruptcy court is **AFFIRMED** and the appeal is **DENIED**.

S/Anita B. Brody

_____

ANITA B. BRODY, J.

O:\ABB\Myers 10_17_05.wpd